IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |  |
|---|---|---|
| ROSE ANNA PARK, | ) | CASE NO.  1:23-CV-01466-JRA |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | JUDGE JOHN R. ADAMS |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |

Plaintiff, Rose Park ("Plaintiff" or "Park"), challenges the final decision of Defendant, Martin O'Malley,[1] Commissioner of Social Security ("Commissioner"), denying her applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I.    PROCEDURAL HISTORY

In April 2010, Park filed an application for POD, DIB, and SSI, alleging a disability onset date of July 31, 2007, and claiming she was disabled due to back pain, bulging disc, degenerative disc disease, trouble sleeping, high blood pressure, irritable bowel syndrome, nervousness, depression, allergy to

---

[1] On December 20, 2023, Martin O'Malley became the Commissioner of Social Security.

1

antidepressants, and vision problems.  (Transcript ("Tr.") 80, 568.)  The applications were denied initially and upon reconsideration, and Park requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 568.)

On February 2, 2011, ALJ Daugherty found Park disabled beginning July 31, 2007.  (*Id.*)  At the time, attorney Eric Conn represented Park.  (*Id.*)

The Office of Inspector General ("OIG") later notified the Social Security Administration pursuant to section 1129(l) of the Social Security Act that "there was reason to believe fraud was involved in certain cases where Eric Conn or his law firm was the appointed representative" and identified this case in its section 1129(l) referral.  (*Id.*)  As required by law under sections 205(u) and 1631(c)(7) of the Social Security Act, the Agency "redetermined the case and issued a new decision on January 3, 2017."  (*Id.*)

In *Hicks v. Commissioner of Social Security*, 909 F.3d 786 (6th Cir. 2018), the Sixth Circuit "held that before disregarding evidence during a redetermination, the agency must provide a factual basis for the reason to believe fraud was involved in providing evidence, and individuals must have a chance to rebut the agency's assertions through a neutral decisionmaker."  (*Id.*)  The Agency issued Acquiescence Ruling 19-1(6) in response to *Hicks*, and the Federal District Court for the Eastern District of Kentucky remanded Park's case back to the Agency to comply with *Hicks*.  (*Id.* at 568-69.)

On March 14, 2023, an ALJ held a hearing, during which Park, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.* at 569.)  On April 4, 2023, the ALJ issued a written decision finding Park was not disabled.  (*Id.* at 568-81.)  Park then appealed directly to this Court.

On July 27, 2023, Park filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 6, 10-11.)  Park asserts the following assignments of error:

(1)     The ALJ committed harmful error when she found that Plaintiff was involved in the finding of fraud or similar fault in this matter.

(2)     The ALJ committed harmful error when she found that there was insufficient evidence to find that Plaintiff was disabled prior to February 2, 2011.

(3)     The ALJ erred at Step Two of the Sequential Evaluation when she failed to properly apply the criteria of Social Security Ruling 96-8p and consider all of Plaintiff's impairments and related limitations when forming the RFC.

(4)     The ALJ's finding that Plaintiff could perform skilled or semi-skilled work at the light level of exertion was not supported by substantial evidence.

(Doc. No. 6.)

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Park was born in September 1959 and turned 50 years-old during the relevant period of time (Tr. 80),[2] making her a "person closely approaching advanced age" under Social Security regulations.  *See* 20 C.F.R. §§ 404.1563(d), 416.963(d).  She has past relevant work as an administrative clerk, receptionist, payroll clerk, and general merchandise sales representative.  (Tr. 580.)

### B.   Relevant Medical Evidence[3]

On April 17, 2007, Park sought treatment for low back pain after twisting her back when she got out of a truck.  (*Id.* at 326.)  On examination, treatment providers found diffuse muscle spasms of the lumbar spine and diagnosed a lumbar strain.  (*Id.* at 327.)  Treatment providers prescribed a prednisone taper and methadone.  (*Id.*)

A May 14, 2007 lumbar MRI revealed mild to moderate spondylosis.  (*Id.* at 374.)

On June 2, 2007, Park sought treatment for abdominal pain and follow up of her lumbar degenerative disc disease.  (*Id.* at 320.)  Treatment providers noted her lumbar disc disease was stable.

---

[2] The period at issue is July 31, 2007 to February 2, 2011.  (Transcript ("Tr.") 570.)
[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

(*Id.*)  On examination, treatment providers found paraspinal lumbar tenderness and refilled Park's methadone prescription. (*Id.* at 321.)

On August 17, 2007, Park went to an appointment for follow up of her back pain. (*Id.* at 316.) Park's diagnosis consisted of lumbar disc disease and treatment providers noted she was stable on her medications. (*Id.*)  Treatment providers found diffuse lumbar tenderness on examination and continued her methadone. (*Id.* at 317.)

On November 20, 2007, Park had an appointment for medication refills and complained of headaches that were not alleviated by her methadone. (*Id.* at 349.)  Park also reported chronic back pain that radiated down her right leg. (*Id.*)  On examination, treatment providers found tenderness of the lumbar spine and positive straight leg raise test on the right. (*Id.*)  Treatment providers refilled Park's methadone and added another medication for pain control. (*Id.*)

On January 7, 2008, Park sought treatment for her low back pain and new complaints of neck pain. (*Id.* at 347.)  On examination, treatment providers found lumbar and cervical tenderness. (*Id.* at 348.) Treatment providers ordered a cervical MRI and continued methadone. (*Id.*)

A January 17, 2008 lumbar MRI revealed "[s]light increased disc bulging at L3-L4 with development of mild central stenosis" and "[u]nchanged findings at L4-L5 with suspected mild focal compression of the left L5 nerve root and moderate narrowing of the right L4 foramen." (*Id.* at 353-54.)

An MRI of the cervical spine taken the same day revealed "[m]ultilevel cervical spondylosis with no evidence of cord compression or high-grade foraminal stenosis at any level" and congenital fusion at the C2-C3 level. (*Id.* at 359.)

On February 1, 2008, Parks returned to care for her MRI results and for complaints of pain and trouble sleeping. (*Id.* at 345.)  On examination, treatment providers found decreased range of motion of the lumbar spine and negative straight leg raise test. (*Id.* at 346.)

4

On April 8, 2010, Park completed a Pain Questionnaire and reported her back pain, which began on July 31, 2007, was a constant ache with intermittent stabbing pains. (*Id.* at 233, 236.) The pain spread to her head, causing headaches, and to her arms, causing numbness of her hands. (*Id.* at 233.) Rest alleviated her pain a little but not much. (*Id.*) She took methadone and Percocet for her pain; these medications "help[ed] alot but not completely." (*Id.* at 233-34.) She also used a TENS unit, heating pad, and massage machine. (*Id.* at 234.) Park reported she could do light housekeeping, but she must stop every five minutes. (*Id.* at 234-35.) She could walk 50 feet outside her home, although there are days where she can walk 20 feet or less. (*Id.* at 235.) She could stand for 15-20 minutes at a time, although there are days where she can stand for five minutes. (*Id.*) She could sit for 5-10 minutes at a time, although there are days where she can sit for less than five minutes. (*Id.*) She could drive her own car and could do light housekeeping without assistance. (*Id.*) Her boyfriend did most of the chores. (*Id.*)

That same day, Park completed an Adult Function Report and reported she could not sit, stand, walk, bend, lift, or carry anything for long periods of time. (*Id.* at 237, 244.) She spends her day waking up, drinking coffee, and reading the newspaper or watching TV. (*Id.* at 238.) On good days, she tries to do some light housekeeping around the house. (*Id.*) On bad days, she rests on the couch or recliner and watches TV. (*Id.*) She has trouble sleeping because of her pain and bulging disc. (*Id.*) She dresses and bathes at her own pace. (*Id.*) She prepares simple meals daily. (*Id.* at 239.) She used to cook more but cannot stand for long now. (*Id.*) She spends two hours a week with breaks doing light housekeeping. (*Id.*) Her boyfriend helps her. (*Id.*) She can walk, drive a car, and ride in a car. (*Id.* at 240.) She can pay bills, count change, handle a savings account, and use a checkbook/money order. (*Id.*) She watches TV, reads, and visits with friends and family daily. (*Id.* at 241.) She struggles with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, memory, completing tasks, concentration, and using her hands because of her back problems, pain, depression, anxiety, nervousness, and allergic

reaction to anti-depressants. (*Id.* at 242.) She can walk for about 50 feet before needing to rest for about 10 minutes. (*Id.*) She can pay attention for about 10 minutes. (*Id.*) She can follow spoken and written instructions well. (*Id.*) She gets along well with authority figures. (*Id.* at 243.) She does not handle stress or changes in routine well. (*Id.*)

On April 15, 2010, Park saw Anna Patton, M.D., for complaints of bilateral knee pain. (*Id.* at 332.) Park described the pain as aching and cramping and rated the pain as a 7/10. (*Id.*) Park denied loss of motion, loss of sensation, muscle weakness, numbness, and tingling. (*Id.*) Park reported using acetaminophen, NSAIDs, immobilization, ice, and heat with mild relief. (*Id.*) On examination, Dr. Patton found decreased range of motion, effusion, and tenderness along the medial joint line and lateral joint line bilaterally. (*Id.* at 334.) Dr. Patton diagnosed Park with osteoarthritis of the knees and recommended pain medication as needed, as well as supportive care. (*Id.*)

On May 15, 2010, Mofi Wright, M.D., completed an Adult Medical Report for Social Security or SSI Disability and opined that Park was unable to work due to degenerative joint disease. (*Id.* at 389.) Dr. Wright described Park's symptoms as numbness, tingling, and muscle spasms. (*Id.*)

On May 22, 2010, Park saw Wayne Edwards, M.D., for a consultative psychological examination. (*Id.* at 390.) Park reported back and leg problems, disc problems, knee and elbow pain, and poor sleep. (*Id.*) Park also endorsed feeling depressed approximately 70% of the time, as well as no motivation and crying one time a month. (*Id.*) Park told Dr. Edwards she felt hopeless and helpless at times and felt useless all the time. (*Id.* at 391.) She endorsed little energy, low concentration, poor sleep, and okay appetite. (*Id.*) She lived for her granddaughter. (*Id.*) Park denied having ever been in a psychiatric hospital, seeing a psychiatrist, therapist, or counsel, and a history of self-harm episodes. (*Id.*) She had taken Zoloft in the past but did not take any psychotropic medication at present. (*Id.*) Her current medications consisted of methadone, Percocet, Librax, Atacand, and cholesterol medication. (*Id.* at 392.)

Park stated she was allergic to every antidepressant, laxatives, Claritin, and Crestor. (*Id.*) She performed all household chores herself, she held a driver's license, she could care for herself, and she could use public transportation, the telephone, and postal services on her own without much difficulty. (*Id.* at 394.) She got along okay with her family and pretty well with her friends and had no contact with her neighbors. (*Id.*) When she worked, she got along "okay" with her supervisors and peers. (*Id.*) She endorsed difficulty sustaining concentration at home to complete tasks. (*Id.*)

On examination, Dr. Edwards found Park pleasant, cooperative, and appropriately dressed, with good eye contact and normal posture and gait. (*Id.* at 392-93.) Park demonstrated normal speech, a tearful affect at times but other times laughing and smiling, and an affect that was congruent with her mood. (*Id.* at 393.) Dr. Edwards found normal thought content and no evidence of distractibility. (*Id.*) She could recall three out of three objects after one minute and after five minutes. (*Id.*) Dr. Edwards diagnosed Park with pain disorder with psychological features and depressive disorder not otherwise specified. (*Id.* at 395.) Dr. Edwards opined:

> She appeared to be able to perform simple work-related tasks. She was able to ask simple questions and ask for assistance. She had appropriate understanding and remembering capabilities in order to follow one to two-step simple commands. Concentration and persistence were congruent with the patient's level of education. She appeared to be able to work without special supervision. She identified normal hazards and took relatively appropriate precautions. She demonstrated an ability to adapt to changes in a day-to-day work setting without significant impairment. At this time, she appeared to be able to work eight hours a day, five days a week without significant psychiatric symptoms based on the patient's overall presentation and could show improvement with individual counseling and medication management. She gave a history of getting along with supervisors and peers without exhibiting any extreme behaviors. Social interactions were limited with neighbors, but otherwise appropriate. She was able to conduct herself appropriately during this interview.

(*Id.* at 395-96.)

On August 4, 2010, Park saw David Winkle, M.D., for a consultative examination. (*Id.* at 411.) Park complained of back pain, a bulging disc, degenerative disc disease, trouble sleeping, high blood

pressure, irritable bowel syndrome, nervousness, depression, allergies to antidepressants, and vision problems.  (*Id.*)  Park reported her lower back hurt "constantly" and interfered with her sleep.  (*Id.* at 412.) She also had trouble walking and squatting.  (*Id.*)  Park told Dr. Winkle her neck hurt five out of seven days a week and she had trouble turning her head.  (*Id.*)  Park reported a 20-year history of irritable bowel syndrome and told Dr. Winkle she suffered from diarrhea at least three days a week.  (*Id.*)  She reported bowel movements eight times a day.  (*Id.*)  Park denied having any tests or a colonoscopy to evaluate her irritable bowel syndrome.  (*Id.*)

On examination, Dr. Winkle found tenderness of the neck, normal grip strength, dexterity, and fine manipulation, normal neurological exam, intact ability to knee squat, tandem walk, and heel and toe walk, no tenderness of the extremities, no tenderness of the back, no pain with straight leg raising, and reduced range of rotation of the cervical spine to the right.  (*Id.* at 413-14.)  Dr. Winkle noted Park moved around the exam room without an assistive device and no obvious gait problem.  (*Id.* at 414.)  Dr. Winkle opined:

> Due to her back pain and back problems, however, she would be impaired with such things as heavy lifting, bending and stooping.  Also prolonged walking aggravates her back.  She has difficulty turning her neck as well. Going up steps is difficult for her in relation to her back.  As mentioned, prolonged standing aggravates her back and her neck.  Due to her irritable bowel syndrome, she would need to be near bathroom because of this problem.

(*Id.*)

At an appointment on August 30, 2010, Park reported having low back pain since a 1995 motor vehicle accident.  (*Id.* at 424.)  Park also endorsed bilateral knee pain, right worse than left, occasional neck and shoulder pain, and occasional severe occipital-frontal headaches.  (*Id.*)  Her diagnoses included fibromyalgia, headaches, neuralgia, and hypertension.  (*Id.* at 425.)

On September 9, 2010, Park returned to care and reported feeling better since starting Tramadol. (*Id.* at 1423.)  Her knees felt a lot better, and she had less general body pain.  (*Id.*)  Her diagnoses consisted of bilateral sacroiliitis, neuralgia, and fibromyalgia.  (*Id.*)

8

On March 21, 2011, Park reported her back pain was "tolerable," her headaches were "minimal," and her general health was "satisfactory." (*Id.* at 1424.) Park wanted a refill of Tramadol because it helped her fibromyalgia. (*Id.*)

**C.  State Agency Reports**

**1.  Mental Impairments**

On June 7, 2010, Laura Cutler, Ph.D., reviewed the file and opined that Park did not have a severe mental impairment. (*Id.* at 397-409.)

On August 26, 2010, on reconsideration, Larry Freudenberger, Psy.D., affirmed Dr. Cutler's findings. (*Id.* at 83-84.)

**2.  Physical Impairments**

On June 8, 2010, Afton Hornback reviewed the file and opined Park could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. (*Id.* at 71, 77.) Her ability to push and/or pull was unlimited, other than as shown for lift and/or carry. (*Id.* at 71.) Park could occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. (*Id.* at 72.) She could frequently stoop and occasionally kneel, crouch, and crawl. (*Id.*) Her ability to balance was unlimited. (*Id.*)

On August 30, 2010, on reconsideration, Allen Dawson, M.D., affirmed Hornback's findings. (*Id.* at 85-86.)

**D.  Hearing Testimony**

During the March 14, 2023 hearing, Park testified to the following:

- She got fired from her last job because she wasn't able to go to work. (*Id.* at 603.) She called off because of her back pain and leg pain. (*Id.* at 604.) The pain affected her mentally. (*Id.*) She couldn't sleep because of the pain, and as a result she could not concentrate or complete her activities of daily living. (*Id.*) She doesn't tolerate pain well. (*Id.*) It got to the point where she would be crying because of the pain, and she could not make it to the office. (*Id.*)

- She used heating pads, ice, baths in a tub with jets, and topical creams for the pain in addition to her medication.  (*Id.*)  She would also alternate positions between laying down, sitting up, and walking.  (*Id.*)  She could not remember how long she could stand before needing to sit during the relevant time.  (*Id.* at 605-06.)  She would lie down off and on throughout the day.  (*Id.* at 606.)

- Mentally, she lacked the desire to do anything, and her pain caused depression.  (*Id.*)  She had trouble concentrating, including being unable to finish what she started and being unable to start things.  (*Id.*)  When she was in pain, she did not want to be around other people.  (*Id.* at 607.)  She tried several antidepressants, but she was allergic to them.  (*Id.* at 609.)  At the time, she did not have the money for therapy.  (*Id.*)

- She was able to bathe and dress herself.  (*Id.* at 607.)  She did not take out the trash.  (*Id.*)  She cooked occasionally.  (*Id.*)  When she cooked, she would do the prep work a little at a time throughout the day so when she was ready to put it on the stove, all she needed to do was put it on the stove.  (*Id.*)  Even then, she would prepare a vegetable and her boyfriend would do the rest.  (*Id.*)  Her boyfriend or her son would clean and do the shopping.  (*Id.*)

- She would watch TV or listen to music to pass the time.  (*Id.* at 608.)

The VE testified Park had past work as an administrative clerk, receptionist, payroll clerk, and general merchandise sales representative.  (*Id.* at 615-16.)  The ALJ then posed the following hypothetical question:

> Okay.  I'm going to ask you some questions regarding a hypothetical person with the following limits.  All right.  For this first one, let's assume a person who could lift and carry and push and pull up to 20 pounds occasionally and up to 10 pounds frequently.  This person can stand or walk for six hours in an eight-hour workday and sit for six hours in an eight-hour workday.  This person can occasionally climb ramps and stairs but never ladders, ropes, or scaffolds.  This person could occasionally stoop, kneel, crouch, and crawl.  This person must avoid unprotected heights, hazardous machinery, and vibration.  This – pardon me.  Give me just a second to read my notes here.  Let's start here.  Would this allow for the performance of any of the claimant's past work?

(*Id.* at 617.)

The VE testified the hypothetical individual would be able to perform Park's past work as an administrative clerk, receptionist, payroll clerk, and general merchandise sales representative.  (*Id.*)

The ALJ modified the hypothetical to limit the hypothetical individual to standing or walking for two hours in an eight-hour workday.  (*Id.*)  The VE testified the receptionist and payroll clerk jobs would remain.  (*Id.* at 618.)  The VE further testified the hypothetical individual would also be able to perform other representative jobs in the economy, such as document preparer.  (*Id.* at 618-19.)

Counsel for Parks asked the VE whether a hypothetical individual limited to no more than simple, repetitive tasks could perform the past relevant work.  (*Id.* at 620.)  The VE testified the hypothetical individual could not perform the past relevant work.  (*Id.*)  In response to further questioning from counsel, the VE testified there would not be any transferrable skills under that hypothetical.  (*Id.*)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if the claimant: (1) had a disability; (2) was insured when the claimant became disabled; and (3) filed while the claimant was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4)*,* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant

must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Park was insured on the alleged disability onset date, July 31, 2007, and remained insured through December 31, 2012, the date last insured ("DLI"). (Tr. 568, 570.) Therefore, in order to be entitled to POD and DIB, Park must establish a continuous twelve-month period of disability commencing between these dates.[4] Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

---

[4] As set forth *supra* at n.2, the relevant period in this case ended on February 2, 2011.

1.  The beneficiary/recipient met the insured requirements through the date of the prior award, February 2, 2011.  The beneficiary's/recipient's date last insured was December 31, 2012 at the time of the prior award.

2.  The beneficiary/recipient did not engage in substantial gainful activity from July 31, 2007, the alleged onset date, through February 2, 2011, the date of the prior award (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  Through February 2, 2011, the date of the prior award, the beneficiary/recipient had the following severe impairments: cervical and lumbar degenerative disc disease, bilateral knee osteoarthritis, and hypertension (20 CFR 404.1520(c) and 416.920(c)).

4.  Through February 2, 2011, the date of the prior award, the beneficiary/recipient did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that, through February 2, 2011, the date of the prior award, the beneficiary/recipient had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the ability to lift, carry, push, and pull up to 20 pounds occasionally and ten pounds frequently.  She could stand or walk for six hours in an eight-hour workday and sit six hours in an eight-hour workday.  The beneficiary/recipient could occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds.  She could occasionally stoop, kneel, crouch, and crawl.  The beneficiary/recipient must have avoided unprotected heights, hazardous machinery, and vibration.

6.  Through February 2, 2011, the date of the prior award, the beneficiary/recipient was capable of performing past relevant work as an administrative clerk, receptionist, payroll clerk, and general merchandise sales representative.  This work did not require the performance of work-related activities precluded by the beneficiary's/recipient's residual functional capacity (20 CFR 404.1565 and 416.965).

7.  The beneficiary/recipient was not under a disability, as defined in the Act, from July 31, 2007, through February 2, 2011 (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 573-81.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011).

Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of*

14

*Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.    Finding of Fraud or Similar Fault

In Park's first assignment of error, she argues the ALJ erred in finding Park "was involved in the finding of fraud or similar fault in this matter."  (Doc. No. 6 at 8.)  Park maintains that while attorney Conn "admitted to fabricating and falsifying RFC forms and medical reports from Dr. Herr, there is no indication that such a fraudulent report was provided in this matter."  (*Id.* at 9.)  Park argues that a "finding of similar fault . . . can be made only if there is reason to believe, based on a preponderance of the evidence, that the person committing the fault knew the evidence provided was false or incomplete." (*Id.*)  Park asserts that there is no evidence of fraud or similar fault in this case; rather, the ALJ found reason to believe fraud was involved in this case.  (*Id.*)  Park maintains that "[i]n the absence of supporting and substantial evidence demonstrating that Plaintiff was involved in any fraud or similar fault, her

15

benefits should not have been terminated." (*Id.*)  As part of her second assignment of error, Park relatedly argues that the ALJ "found, without any specific facts or basis in evidence, that the report from Dr. Herr was to be disregarded," even though Dr. Herr's report discussed medical imaging.  (*Id.*)

The Commissioner responds that the ALJ applied the correct legal standard in deciding to exclude Dr. Herr's medical report.  (Doc. No. 10 at 9.)  The Commissioner notes that Park was allowed to challenge the exclusion of Dr. Herr's report at the March 2023 hearing.  (*Id.*)  While Park's attorney "initially lodged an objection to 'the issues regarding the fraud,'" later counsel "took the position that, 'regardless of whether you want to, you know, include Judge – Dr. Hess' [*sic*] report or not is really irrelevant in this matter because there is sufficient evidence to support that Ms. Park was disabled at least as of her 50th birthday.'"  (*Id.* at 9-10) (citation omitted).  The Commissioner asserts that Park's argument before this Court "misconstrues both the relevant inquiry and the ALJ's finding."  (*Id.* at 10.)  The Commissioner maintains that the ALJ "properly disregarded" Dr. Herr's report after finding there was reason to believe fraud was involved in the submission of this evidence.  (*Id.* at 11.)  The ALJ explained the basis for her fraud finding and her exclusion of Dr. Herr's report.  (*Id.* at 11-12.)  Therefore, the Court should reject Park's argument that her benefits should not have been terminated "'[i]n the absence of supporting and substantial evidence demonstrating Plaintiff was involved in any fraud or similar fault.'" (*Id.* at 11.)

In reply, Park argues that the only evidence cited by the Commissioner was a statement from the OIG Agent that Park's case "fit within the fraud scheme, not that this matter entailed fraud."  (Doc. No. 11 at 1.)  Park asserts that "[i]n the absence of fraud in this specific case, Plaintiff's case should not have been reevaluated."  (*Id.*)  Park also maintains that the ALJ failed to support the finding that Park's award of benefits was due to fraud.  (*Id.*)  As a result, Park's benefits should be reinstated, or this matter should be remanded for a "full and fair hearing."  (*Id.*)

In the decision, the ALJ found as follows regarding fraud or similar fault in this case:

On April 12, 2010, the beneficiary/recipient filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income. The beneficiary/recipient claimed disability beginning July 31, 2007. The Social Security Administration (SSA) denied these claims initially on June 10, 2010, and at reconsideration on August 30, 2010. The beneficiary/recipient then filed a written request for a hearing on October 21, 2010 (20 CFR 404.929 et seq. and 416.1429 et seq.).

Administrative Law Judge (ALJ) David Daugherty found the beneficiary/recipient disabled beginning July 31, 2007, in an on-the-record decision dated February 2, 2011. At that time, the beneficiary/recipient was represented by Eric C. Conn, an attorney.

The Office of the Inspector General (OIG) later notified SSA, as required by section 1129(l) of the Social Security Act (Act), that there was reason to believe fraud was involved in certain cases where Eric C. Conn or his law firm was the appointed representative. This case was identified by OIG in its section 1129(l) referral.

Under sections 205(u) and 1631(e)(7) of the Act, SSA must redetermine an individual's disability case when there is reason to believe fraud or similar fault was involved in that individual's application for benefits. Because the beneficiary's/recipient's case was identified by OIG in its section 1129(l) referral, by law, SSA redetermined the case and issued a new decision on January 3, 2017.

In *Hicks v. Commissioner of Social Security*, 909 F.3d 786 (6th Cir. 2018), the Court of Appeals for the Sixth Circuit held that before disregarding evidence during a redetermination, the agency must provide a factual basis for the reason to believe fraud was involved in providing evidence, and individuals must have a chance to rebut the agency's assertions through a neutral decisionmaker. The agency acquiesced to the Sixth Circuit ruling on February 4, 2020 in Acquiescence Ruling (AR) 19-1(6), and the Federal District Court for the Eastern District of Kentucky has remanded the beneficiary's/recipient's case back to the Agency to comply with *Hicks*.

* * *

The undersigned must determine whether there is reason to believe fraud or similar fault was involved in providing evidence in support of the beneficiary's/recipient's application for disability benefits. SSA defines "reason to believe" as reasonable grounds to suspect that fraud or similar fault was involved in the application or in the provision of evidence. The "reason to believe" standard requires more than a mere suspicion, speculation, or

hunch, but it does not require a preponderance of the evidence.  Furthermore, adjudicators may make reasonable inferences based on the totality of circumstances, such as facts or case characteristics common to patterns of known or suspected fraudulent activity.  It is not necessary that the affected beneficiary or recipient had knowledge of or participated in the fraud or similar fault.  Finally, adjudicators will consider any objections to the disregarding of evidence based on fraud or similar fault (AR 19-1(6)).

As described in the OIG affidavit, Mr. Conn admitted to fabricating residual functional capacity forms, medical summary reports, and x-ray reports.  Mr. Conn also admitted to paying four medical professionals for their signature on the falsified documents.  David Herr, D.O., is one of the identified co-conspirators of this scheme.  Moreover, Mr. Conn also admitted to paying ALJ David Daugherty to decide that Mr. Conn's clients were disabled (Exhibit 16D).

In this case, Mr. Conn represented the beneficiary/recipient during the initial application for benefits.  Additionally, the record contains an examination that occurred in Mr. Conn's office and an opinion by Dr. Herr with the opining satisfying SSA's criteria for establishing disability (Exhibit 20F). Furthermore, the beneficiary's/recipient's original decision awarding benefits was issued by ALJ Daugherty on-the-record, relying entirely on Dr. Herr's report (Exhibit 8A/7).  Given the similarities between Mr. Conn's admitted fraud scheme and the facts of this case, there is reason to believe that fraud or similar fault was involved in the submission of evidence from Dr. Herr. Therefore, this evidence has not been considered.

At the hearing, the beneficiary's/recipient's representative argued that other evidence in the record supports Dr. Herr's findings, such as the consultative examination at Exhibit 5F, and therefore, whether Dr. Herr's evidence is disregarded is irrelevant.  The undersigned notes this argument, and for the reasons enumerated above, finds reason to believe fraud or similar fault was involved in Dr. Herr's examination.  The undersigned has considered the remaining evidence that is new, material, and relevant to the period at issues [sic], as discussed in greater detail below.

(Tr. 568-70.)

SSR 22-2p, effective May 17, 2022, "revis[ed] the evidentiary standard for similar fault from a 'preponderance of the evidence' to 'reason to believe' to align more closely with the standard provided in the Act" and "provide[d] that, before we disregard evidence under the Act at the hearings level of our administrative review process, we will consider the individual's objection to the disregarding of that

18

evidence."  2022 WL 2533117 at *1.  SSR 22-2p rescinded and replaced SSR 16-2p (*id.*) and was in effect at the time of the March 14, 2023 hearing in this case.  *See id.  See also* 2022 WL 2533116 at *1.

SSR 22-2p defines reason to believe as follows: "Reason to believe means reasonable grounds to suspect that fraud or similar fault was involved in the application or the provision of evidence. The reason to believe standard requires more than mere suspicion, speculation, or a hunch, but it does not require a preponderance of evidence."  *Id.* at *4.  SSR 22-2p requires that, in deciding whether there is similar fault in a case, all adjudicators must:

- Consider all evidence in the case record before determining whether specific evidence must be disregarded.

- Determine if there is a reason to believe, as defined in this ruling, that similar fault was involved in the provision of evidence. Adjudicators may make reasonable inferences based on all the information in the record such as facts or case characteristics common to patterns of known or suspected fraudulent activity. *For us to disregard evidence, it is not necessary that the affected beneficiary or recipient had knowledge of or participated in the fraud or similar fault.*

- Disregard the evidence and fully document the record with the description of the disregarded evidence and the reasons for disregarding the evidence, if the adjudicator determines that there is a reason to believe similar fault was involved in the provision of the evidence.

*Id.* at *5 (emphasis added).  In addition, SSR 22-2p requires that, in determinations involving a finding of similar fault, the notice of determination or decision must:

1. Explain the applicable provision of the Act that allows the adjudicator to disregard particular evidence due to a similar fault finding.

2. Identify the documents or other evidence that is being disregarded.

3. Provide a discussion of the evidence that supports a finding to disregard evidence. The discussion must explain that, in accordance with the law, the evidence identified cannot be used as evidence in a claim because, after considering all the information in the case record, the adjudicator has reason to believe that similar fault was involved in providing the evidence. A similar fault finding can be made only if there is reason to believe the person knew that the evidence provided was false or incomplete. A similar fault finding cannot be based on speculation or suspicion.

19

4. Provide a determination or decision based on an evaluation of the remaining evidence in accordance with other rules and procedures. A similar fault finding does not constitute complete adjudicative action in any claim. A person may still be found entitled to benefits or eligible for payments despite that some evidence in the case record has been disregarded based on similar fault. For example, a person may be found to be under a disability based on impairments that are established by evidence that is not disregarded because of similar fault.

5. Include standard appeal language.

*Id.*

The Court finds the ALJ "applied the proper standard according to the plain text" of 42 U.S.C. § 405(u) and complied with SSR 22-2p. *Ison v. Kijakazi*, Civil Action No. 5: 23-054-DCR, 2023 WL 4411026, at *4 (E.D. Ky. July 7, 2023). The ALJ set forth the proper standards in the decision and explained her reasoning regarding the finding of fraud or similar fault. As part of that explanation, the ALJ considered counsel's argument (the same counsel representing Park on judicial review) that other record evidence supported Dr. Herr's findings, such as the consultative examination, and therefore, whether the ALJ disregarded Dr. Herr's report was irrelevant. (Tr. 595, 600-01.)

As the Eastern District of Kentucky recently explained in an analogous case:

The reason-to-believe standard is a "very low bar," lacking a requirement that "the Commissioner ... provide evidence specifically tying the fraud to their individual applications." *Hicks*, 909 F.3d at 820 (Rogers, J., dissenting).

Here, ALJ Wallis excluded Dr. Huffnagle's report because, *inter alia*, Conn admitted to fabricating medical reports and paying ALJ Daugherty and four physicians for their signature, including Dr. Huffnagle. Ison was represented by Conn during the relevant period, and ALJ Daugherty awarded Ison benefits, "relying entirely on Dr. Huffnagle's report." [Record No. 8, pp. 76, 468] The ALJ further explained that there was reason to believe fraud was involved, "[g]iven the similarities between Mr. Conn's admitted fraud scheme and the facts of this case," and "[t]herefore, this evidence has not been considered." [ *Id.* at 468, 96 S.Ct. 893] And her decision to exclude Dr. Huffnagle's report was supported by an OIG agent's affidavit and testimony establishing Conn's underlying fraudulent scheme. Given the standard's "very low bar," the evidentiary exclusion is supported by substantial evidence.

*Ison*, 2023 WL 4411026, at *4.

There is no error.

**B.      Step Two Challenge**

In her third assignment of error, Park argues that the ALJ erred at Step Two in finding Park's psychological impairments and irritable bowel syndrome non-severe impairments.  (Doc. No. 6 at 12-13.) Park asserts the ALJ further erred by violating SSR 98-6p when the ALJ failed to consider Park's psychological impairments and irritable bowel syndrome in combination with her pain and physical limitations in forming the RFC.  (*Id.* at 13-14.)  Therefore, Park maintains, the ALJ's determination lacks the support of substantial evidence.  (*Id.* at 14.)

The Commissioner responds that the ALJ acknowledged Park's depressive disorder and irritable bowel syndrome and explained her findings that these impairments were non-severe.  (Doc. No. 10 at 15.) In addition, the ALJ's decision shows the ALJ considered all of Park's impairments, both severe and non-severe, in the RFC analysis.  (*Id.* at 15-16.)  "In sum, Plaintiff – with the burden of proof on RFC – did not establish that additional limitations were warranted on account of her non-severe impairments."  (*Id.* at 16.)

The Act defines a disability as "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A medically determinable impairment is one that results from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory techniques.  *See* 20 CFR §§ 404.1521, 416.921; Social Security Ruling ("SSR") 96–4p, 1996 WL 374187, at *1 (July 2, 1996).  A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings.  *Id.*

"[U]nder no circumstances may the existence of an impairment be established on the basis of symptoms alone." *Id.* Thus, "regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings." SSR 96–4p (footnote omitted). *See also* 20 C.F.R. §§ 404.1529(b), 416.929(b) ("Your symptoms . . . will not be found to affect your ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present."). *See also Torrez v. Comm'r of Soc. Sec.*, No. 3:16CV00918, 2017 WL 749185, at *6 (N.D. Ohio Feb. 6, 2017), *report and recommendation adopted by* 2017 WL 735157 (N.D. Ohio Feb. 24, 2017); *Crumrine-Husseini v. Comm'r of Soc. Sec.*, 2:15-cv-3103, 2017 WL 655402, at *8 (S.D. Ohio Feb. 17, 2017), *report and recommendation adopted by* 2017 WL 1187919 (N.D. Ohio March 30, 2017). The claimant bears the burden of establishing the existence of a medically determinable impairment. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence thereof as the Secretary may require."). *See also Kavalousky v. Colvin*, No. 5:12-CV-2162, 2013 WL 1910433, at *7 (N.D. Ohio April 19, 2013), *report and recommendation adopted by* 2013 WL 1910843 (N.D. Ohio May 8, 2013).

Once an ALJ has determined a claimant has a medically determinable impairment, the ALJ must then determine whether that impairment is "severe" for purposes of Social Security regulations. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). As noted *supra*, the regulations define a "severe" impairment as an "impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities . . ." 20 CFR §§ 404.1520(c), 416.920(c). "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1522(b), 416.922(b). Examples include: (1) physical functions such as walking, standing, sitting,

lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id*.

The Sixth Circuit construes the step two severity regulation as a "*de minimis* hurdle," *Rogers*, 486 F.3d at 243 n.2, intended to "screen out totally groundless claims." *Farris v. Sec'y of Health & Human Servs*., 773 F.2d 85, 89 (6th Cir.1985). *See also Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008). Thus, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ must treat it as "severe." SSR 96–3p, 1996 WL 374181, at *1 (July 2, 1996). However, if an ALJ makes a finding of severity as to just one impairment, the ALJ then "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96–8p, 1996 WL 374184 at *5 (July 2, 1996). This is because "[w]hile a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim." *Id*. "For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do." *Id*.

When the ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, the failure to find additional severe impairments at Step Two does "not constitute reversible error." *Maziarz v. Sec'y of Health & Human Servs*., 837 F.2d 240, 244 (6th Cir. 1987); *see also Nejat v. Comm'r of Soc. Sec*., 359 F. App'x 574, 577 (6th Cir. 2009). The Sixth Circuit has observed that where a claimant clears the hurdle at Step Two (*i.e.*, an ALJ finds that a claimant has established at least

one severe impairment) and a claimant's severe and non-severe impairments are considered at the remaining steps of the sequential analysis, "[t]he fact that some of [claimant's] impairments were not deemed to be severe at step two is ... legally irrelevant." *Anthony*, 266 F. App'x at 457.

At Step Two, the ALJ found Park's cervical and lumbar degenerative disc disease, bilateral knee osteoarthritis, and hypertension to be severe impairments.  (Tr. 573.)  The ALJ further found as follows:

> The record also shows a diagnosis of hypothyroidism.  However, the beneficiary/recipient was not taking Synthroid due to weight gain and alleged no symptoms stemming from this condition (Exhibits 2F/19, 3F/15). Moreover, the beneficiary/recipient reported a 20-year history of irritable bowel syndrome (IBS) but denied any treatment for this condition, and her earnings records demonstrate it did not preclude her ability to work successful [sic] over that period of time (Exhibit 4D-11D, 16D-18D, 7F/2).  There is no indication these impairments imposed more than mild limitations on the beneficiary's/recipient's functioning during the relevant period.  Therefore, they were nonsevere.
>
> The beneficiary's/recipient's medically determinable impairments of depressive disorder and pain disorder, considered singly and in combination, did not cause more than minimal limitation in the beneficiary's/recipient's ability to perform basic mental work activities and were therefore nonsevere (Exhibit 5F/6.)  The beneficiary/recipient received no mental health treatment and took no psychotropic medications during the period at issue (Exhibit 5F/2).

(*Id.*)  The ALJ then considered all four broad functional areas set forth in the "paragraph B" criteria and determined Park had mild limitations in the areas of activities of daily living, social functioning, and maintaining concentration, persistence or pace and no limitation in the area of repeated episodes of decompensation, each of extended duration.  (*Id.* at 573-74.)  The ALJ found that "[b]ecause the beneficiary's/recipient's medically determinable mental impairments caused no more than 'mild' limitation in any of the functional areas <u>and</u> the evidence does not otherwise indicate that there was more than a minimal limitation in the beneficiary's/recipient's ability to do basic work activities, they were nonsevere (20 CFR 404.1520a(d)(1) and 416.920a(d)(1))."  (*Id.* at 574) (emphasis in original).

The ALJ also gave great weight to the opinions of the state agency psychological consultants, who opined that Park's mental impairments were non-severe and caused mild limitations the areas of activities of daily living, social functioning, and maintaining concentration, persistence, or pace, with no episodes of decompensation.  (*Id.* at 574-75.)  Park fails to challenge the weight assigned to the state agency reviewing psychologists on judicial review.  (Doc. No. 6.)

The ALJ provided a thorough and detailed analysis to support her determination that Park's mental impairments and irritable bowel syndrome were non-severe impairments.  The ALJ expressly considered Park's mental impairments and irritable bowel syndrome in the RFC analysis.  (*Id.* at 577-80.)  As the ALJ considered Park's impairments, severe and non-severe, in the RFC analysis, there is no reversible error.

## C.    RFC Challenge

As part of her second assignment of error, Park argues that imaging and other record evidence support "a finding that Plaintiff was limited to the sedentary level of exertion (she turned 50 years of age on September [**], 2009, well within the relevant period)."  (Doc. No. 6 at 9-11.)  Park asserts that the ALJ's conclusion that Park was not disabled before February 2, 2011 lacked the support of substantial evidence.  (*Id.* at 11.)  Park maintains the evidence shows she was limited to sedentary work and simple work tasks.  (*Id.* at 11-12.)  In her fourth assignment of error, Park reiterates her argument challenging the ALJ's RFC finding and argues that the ALJ erred in her subjective symptom analysis, as Park's pain interfered with her ability to sit, stand, and walk, as well as maintain attention and concentration, on a full-time and sustained basis.  (*Id.* at 14-15.)  In addition, Park's mental impairments would limit her to one to two step tasks.  (*Id.* at 16.)

The Commissioner responds that substantial evidence supports the ALJ's RFC finding.  (Doc. No. 10 at 12.)  The ALJ considered the evidence cited by Park, including her allegations regarding pain.  (*Id.* at 13.)  In addition, Park fails to "directly challenge" the ALJ's evaluation of the opinion evidence and

25

therefore waived any such argument.  (*Id.*)  The Commissioner asserts that, in lieu of challenging the ALJ's actual analysis, Park "simply provides her own summary of the medical evidence and her subjective complaints, believing that the record contains evidence supportive of her allegations."  (*Id.* at 14.)  "However, '[r]eciting medical evidence does not show that the ALJ's decision is not supported by substantial evidence.'"  (*Id.*) (quoting *Garcia v. Comm'r of Soc. Sec.*, No. 1:22-CV-1044, 2023 WL 2333520, at *7 (N.D. Ohio Jan. 27, 2023)).

In reply, Park argues that the ALJ "failed to consider all the evidence and support her RFC with substantial evidence."  (Doc. No. 11 at 2.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 416.945(a)(1).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. § 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R. § 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. § 416.946(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address

medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.").  While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered.  *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*).  However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability.  *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").  *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

Substantial evidence supports the RFC findings.  In the RFC analysis, the ALJ found as follows:

While the undersigned agrees the beneficiary's/recipient's impairments imposed limitations during the relevant period at issue, the record does not support limitations beyond those contained in the residual functional capacity. Imaging of the beneficiary's/recipient's cervical and lumbar spine support the light exertion and reduced postural activities, as does evidence of bilateral knee osteoarthritis (Exhibits 2F/2; 3F/2-3, 8, 23).  Moreover, in consideration of potential symptoms of hypertension and pain, the undersigned finds that restrictions to heights, hazardous machinery, and vibration are supported to reduce exposure to possible dangerous or symptoms-exacerbating settings (Exhibit 2F/13).  These limitations are also supported by examinations findings of tenderness and right straight leg raising, as well as pain management during the relevant period (Exhibits 1F, 2F, 3F).  However, the record does not support additional limitations.  The beneficiary's/recipient's consultative examination was completely unremarkable except for slightly decreased right rotation in the cervical spine (Exhibit 7F/3, 5-6).  There are no objective findings of decreased sensation or strength in the record.  Moreover, the beneficiary/recipient eventually reported improvement in pain, stability with medication, and described her general health as satisfactory (Exhibits 1F/2, 7; 2F/16; 17F/4-5).  While she received opioid pain management and took measures, such as baths and lying down, for her pain, the record does not show any surgical consultations or epidural steroid injections.  Additionally, the beneficiary/recipient described a generally full range of activities of daily living, including driving, preparing simple meals, light household cleaning, and perhaps even acting as caretaker for her granddaughter (Exhibits 3E, 5F). Therefore, the residual functional capacity accommodates the beneficiary's/recipient's conditions during the relevant period, and the evidence does not support the need for additional restrictions.

(Tr. 579.)

Substantial evidence also supports the ALJ's assessment of Park's subjective complaints.  The record evidence, as noted by the ALJ, is not entirely consistent with Park's allegations of disabling conditions.  (*Id.* at 577-80.)  Contrary to Park's allegations, the ALJ credited some of her subjective symptoms but did not accept them to the extent alleged by Park because of findings on examinations and her own statements, factors to be considered under the regulations.  (*Id.*)  Furthermore, the ALJ's extensive discussion of the relevant medical evidence included several findings that undercut a finding of disability.  (*Id.*)  The Court finds it is able to trace the path of the ALJ's reasoning regarding the subjective symptom evaluation in the decision.  "Reciting medical evidence does not show that the ALJ's decision is not supported by substantial evidence."  *Garcia*, 2023 WL 2333520, at *7 (N.D. Ohio Jan. 27, 2023).

28

And the findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton*, 246 F.3d at 772-73.

There is no error.

## D.    Waiver

In her reply brief, Park raises two arguments for the first time.  (Doc. No. 11.)  First, she asserts that the issue of disability after February 2, 2011 was not addressed by the ALJ, and therefore remand is required.  (*Id.* at 2.)  Second, Park asserts that Dr. Edwards opined she was limited to simple, work-related tasks and understanding one to two step simple commands.  (*Id.*)  However, despite giving Dr. Edwards' opinion great weight, the ALJ did not include the limitation to simple, repetitive tasks in the RFC; therefore, a remand is required.[5]  (*Id.*)

The Court will not address arguments raised for the first time in a Reply Brief.  As this Court has explained:

> It is well-established that a party should not raise new arguments in a reply brief. *Scottsdale Ins. Co. v. Flowers,* 513 F.3d 546, 553 (6th Cir. 2008). A reply brief provides a plaintiff the opportunity to respond to arguments raised for the first time in the defendant's brief. But, the plaintiff cannot wait until its reply brief to assert new arguments because such a practice would effectively deprive the defendant of the opportunity to expose weaknesses in the plaintiff's arguments. *Id.* "These waiver and forfeiture rules ensure fair and even-handed litigation by requiring parties to disclose legal theories early enough in the case to give an opposing party time not only to respond but also to develop an adequate factual record supporting their side of the dispute." *Winnett v. Caterpillar,* Inc., 553 F.3d 1000, 1007 (6th Cir. 2009). District courts in this circuit have applied this doctrine in Social Security cases. *E.g. Caley v. Astrue,* No. 5:11–CV–1146, 2012 WL 1970250, at *15, n. 11 (N.D. Ohio June 1, 2012) (Vecchiarelli, J.); *Hamilton v. Comm'r of Soc. Sec.*, No. 1:09–CV–260, 2010 WL 1032646, at *6 (N.D. Ohio Mar.17, 2010) (White, J.); *Johnson v. Comm'r of Soc. Sec.*, No. 1:09–CV–967, 2011 WL 4954049, at *11 (W.D. Mich. Sept. 22, 2011).

---

[5] While in her opening brief Parks argued that "there was a consultative examination, along with Plaintiff's testimony, which supported the fact that" Park was limited to simple work tasks, and that the VE testified that an individual limited to no more than simple, repetitive tasks could not perform Park's past work and there would be no transferrable skills (Doc. No. 6 at 12, 16), Park did not raise this particular argument.

*Bender v. Comm'r of Soc. Sec.*, 2012 WL 3913094, at *8 (N.D. Ohio Aug. 17, 2012).  *See also Daniels v. Colvin*, 2015 WL 4394412, at *18 (N.D. Ohio July 16, 2015).  Because Park failed to challenge the ALJ's decision on these bases in her Brief on the Merits, the Court deems these arguments waived and will not address them further.

### VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: April 25, 2024                                        _s/ Jonathan Greenberg_
                                                            Jonathan D. Greenberg
                                                            United States Magistrate Judge

### **OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**